FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

2017 JUN 22 PM 2:34

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

UNITED STATES OF AMERICA, ex rel.,
MELISSA STRUNK,

                Plaintiff/Relator,

v.

2:17-cv-352-FtM-99CM

WAYNE ISAACSON, M.D.,
COLLIER ANESTHESIA PAIN, LLC,
PHYSICIANS SURGERY CENTER, LLC,
d/b/a LEE ISLAND COAST SURGERY
CENTER and CAPE CORAL SURGERY
CENTER, LTD.,

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. 3730(b)(2)**

                Defendants.

_____/

## COMPLAINT PURSUANT TO FALSE CLAIMS ACT (31 U.S.C. § 3730(b)(2))

COMES NOW, United States of America ex rel. Melissa Strunk (hereinafter referred to as "Relator"), and hereby submits the following Complaint under seal in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2).

### I.    NATURE OF THE ACTION

1.    Plaintiff/Relator Melissa Strunk brings this action on behalf of the United States of America ("United States" or "Government"), to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. § 3730(b)(1).

2.    Relator's claims against Defendants under the FCA are based upon false certifications and false or fraudulent claims that Defendants presented, or caused to be presented, to Medicare for reimbursement of pain injection services provided to the patients that the Defendants illegally induced to utilize Defendants services under the AKS and/or the Stark Law.

3.    Beginning on or around at least January 2013, and continuing through the filing

(5-1)

of this complaint ("relevant period"), Defendants engaged in a fraudulent remuneration scheme, waiving co-payment obligations that had caused them a loss in business. .

4.      Defendants essentially provided kickbacks to Medicare beneficiaries by routinely waiving their copayments in whole or in part, which is the amount the beneficiaries were required to pay for services rendered, without an individualized determination of financial hardship or exhaustion of reasonable collection efforts, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b and the Stark Law, 42 U.S.C. § 1395nn.  Although Defendant waived the copayments, it included the copayment amounts in billings submitted to Medicare for reimbursement, thereby falsely inflating its bills to Medicare for those services.

5.      Defendants knew they were not entitled to payment from federal payors for services procured in violation of the AKS and/or the Stark Law, but submitted falsified documentation in an attempt to circumvent such laws.

6.      Defendants' engagement in this fraudulent scheme resulted in the inducement of federal program business and the submission of false and fraudulent claims for reimbursements from Medicare, all in violation of the federal Civil Monetary Penalties Law (CMPL), 42 U.S.C. § 1320a-7a(a)(5).  The CMPL prohibits offering or transferring remuneration to federal program beneficiaries if the provider knows or should know that the remuneration is likely to influence the beneficiary to order or receive items or services payable by federal or state healthcare programs from a particular provider.  The CMPL specifically defines "remuneration" to include waivers of co-pays and deductibles. (42 U.S.C. § 1320a-7a(i)).

## II.   JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

8.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the acts committed by Defendants in violation of the FCA occurred in the Middle District of Florida, and because one or more of Defendants can be found, reside, and/or transact business in the Middle District of Florida.

9.      Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events giving rise to the claims alleged in this action occurred in the Middle District of Florida.

## III.    PARTIES

### A.   Relator

10.     Melissa Strunk ("Relator") is a citizen of the United States and resides in the state of Florida. Relator was first employed by Cape Coral Surgery Center starting in January 2011 and began working additionally for Lee Island Coast Surgery Center in mid-2013. Relator presently works for both facilities as a biller responsible for collecting self-payments and posting all payments to patient's accounts.

11.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

### B.   Defendants

12.     Wayne Isaacson, M.D. (Dr. Isaacson), NPI number 1215928189, is licensed by the state of Florida as a Medical Doctor with his original license granted on July 29, 1996 and expiring on January 31, 2019.  Dr. Isaacson resides at 12100 Linton Road, Fort Myers, Florida 33908, and owns and operates Collier Anesthesia Pain, LLC.

13.     Collier Anesthesia Pain, LLC is a for-profit, limited liability corporation, organized under the laws of the state of Florida with a principal address of 4035 Evans Avenue,

Suite 1, Fort Myers, Florida 33901. Collier Anesthesia Pain, LLC, lists Dr. Isaacson as its manager in its Articles of Organization filed with the state of Florida. Collier Anesthesia Pain, LLC, was previously known as Collier Anesthesia Pain, PA, and also listed Dr. Isaacson as its President. Collier Anesthesia Pain, PA was converted to an LLC in September 2016. Collier Anesthesia Pain, PA processes all billing for the professional fee for Dr. Isaacson's treatments performed at Cape Coral Surgery Center, Ltd. and Lee Island Coast Surgery Center.

14. Cape Coral Surgery Center, Ltd. (CCSC) is listed with the state of Florida Secretary of State and shows its current principal place of business as One Park Plaza, Nashville, Tennessee, 37203. CCSC's physical location is at 2721 Del Prado Boulevard South, Cape Coral, Florida 33904. Dr. Isaacson sees and treats patients at this facility.

15. Physicians Surgery Center, LLC, d/b/a Lee Island Coast Surgery Center (LISC) is listed with the state of Florida Secretary of State which lists its currently principal place of business as 4035 Evans Avenue, Fort Myers, Florida 33901. Dr. Isaacson sees and treats patients at this facility.

## IV. DEFENDANTS' FRAUDULENT SCHEME

16. In January 2011, Relator first became employed with Cape Coral Surgery Center. Dr. Isaacson essentially rented space from Cape Coral Surgery Center one day a week, at which time pain management patients would come in for appointments and receive injections as needed. If injections were done, a bill was generated for the use of the facility in addition to the bill associated with Dr. Isaacson's professional component. Cape Coral Surgery Center submits billing for the use of the facility, while Collier Anesthesia Pain, LLC, submits billing for the professional fee on behalf of Dr. Isaacson.

17. Relator initially worked at Cape Coral Surgery Center part-time through a

temporary placement agency, but was made full-time within two weeks. Her job responsibilities included collecting self-payments and posting all patient payments. On June 20, 2011, Relator was hired permanently by Defendant.

18.     At the beginning of her employment, Relator's immediate supervisor was Christina Rhodes while Jackie Paul served as the administrator, and Heather Moore was the main biller.

19.     On January 9, 2013, Relator received an email from Heather Moore, who had since been promoted from biller to Assistant Business Officer Manager. The email advised Relator that all Medicare Advantage patients were only to be billed $100 with any remaining co-pay to be written off per Defendant Dr. Isaacson.

20.     After working at Defendant Cape Coral Surgery Center for two years, Relator learned that there were two physicians that she should not question when they said to do something: Defendant Dr. Isaacson and Dr. John Kagan.

21.     Soon after receiving Heather Moore's email with the instructions to write off Medicare Advantage patients' co-pays, Relator spoke with her supervisor, Christina Rhodes, to find out exactly how she was supposed to account for, or write off, the amounts above $100.

22.     Christina Rhodes told Relator that she was to record in the billing records that the waived co-pay was a "courtesy adjustment." No discussion of financial need was mentioned by Rhodes or anyone else. Relator did as she was instructed and entered courtesy adjustments for all Medicare Advantage patients who received pain injections during this time.

23.     In May 2013, Defendant Cape Coral Surgery Center lost its gastrointestinal (GI) group. As a result, Relator's work hours dropped below 40 hours a week, so she submitted a letter of resignation in order to seek more hours elsewhere. Relator was asked by Jackie Paul,

Christina Rhodes, and Heather Moore to rescind her resignation. Relator was offered a raise and told that she could get the 40 hours a week she needed by working half days at Defendant Cape Coral Surgery Center and half days at Defendant Lee Island Coast Surgery Center. Relator agreed to rescind her resignation, eventually moving to Defendant Lee Island Coast Surgery Center full-time while continuing to work at both centers on occasion.

24.     During this time, Relator continued to record the "courtesy adjustments" which could range from $100 to as much as $250, all dependent upon the Medicare Advantage patient's insurance co-pay requirement per their particular plan.

25.     Relator was specifically instructed that the most any Medicare Advantage patient was to pay was $100 on such procedures, regardless of whether or not a financial need existed.

26.     Initially, surgery schedulers Latisha Ramirez and Aubrey Brown would put notes in the patient records that stated, "patient only to pay $100 per Dr. I." However, as time passed, Latisha Ramirez and Aubrey Brown were replaced in the scheduling department and their replacements discontinued putting the explicit notes regarding co-pay waivers. To be clear, despite the absence of these notes, the practice of waiving or reducing co-pays continued after their departures through the date of filing this complaint.

27.     In September 2016, due to all of the many changes that had occurred in staffing and the discontinuance of any notes in the patient records, Relator approached Christina Rhodes, who had been promoted to Business Officer Manager for both Defendants Cape Coral Surgery Center and Lee Island Coast Surgery Center. Relator sought to confirm whether she was still supposed to take courtesy adjustments for Defendant Dr. Isaacson's Medicare Advantage patients.

28.     Christina Rhodes instructed Relator to continue making the "courtesy

adjustments," but that "it could not be documented" in the patient's records, only in the billing records, and that any amount above a $100 co-pay was to be waived and written off per Defendant Dr. Isaacson "who is the Medical Director, and what he says goes."

29.      Even minor amounts of payment due for services rendered are not collected and are written off as bad debts.  In some instances, this has been done in order to keep patients returning for additional procedures.  Relator is not allowed to contact any of Defendant Dr. Isaacson's patients for facility charges due and no attempt is made to collect facility charges that have not been paid by patients.  This practice does not take place with regard to any other type of insured or private pay patient.

30.      Relator was told by Mary Loucks that Logan Laboratories, which processes drug screening tests routinely ordered by Defendant Isaacson, does not collect from his patients any amounts due, not covered by insurance, due to an "agreement" with Dr. Isaacson.  When Defendant Isaacson's patients call the facility about Explanation of Benefits (EOBs) they've received from their insurance companies where lab test fees are denied, Relator has been instructed by Mary Loucks to tell the patients "not to worry about it that they will not receive a bill from Logan Laboratories."

## V. <u>PATIENT EXAMPLES</u>

31.      The following patient examples are but a small sample of the total universe of patients who had their co-pays lowered or waived, in violation of the Anti-Kickback Statute and the Civil Monetary Penalties Law, at the direction of Defendant Dr. Isaacson over the last four and a half years:

**Medicare Advantage Patient # 0001**

32.     Medicare Advantage patient #0001[1], covered by a Medicare Advantage insurance plan from United Health Care known as Medicare Complete, with a co-pay of $250 due per treatment, was treated by Defendant Isaacson at Defendant Lee Island Coast Surgery Center on numerous occasions. A review of the billing receipt for patient #0001 shows the following:

| Date of Service | Procedure | Amount Billed | Courtesy Discount |
|---|---|---|---|
| 1/24/2013 | SI Joint Injection | $1,058.00 | |
| 2/21/2013 | SI Joint Injection | $1,058.00 | |
| **3/15/2013** | **Courtesy Adjustment** | | **$-150.00** |
| **3/15/2013** | **Courtesy Adjustment** | | **$-150.00** |
| 5/2/2013 | Injection, Single | $1,065.00 | |
| 5/16/2013 | Injection, Single | $1,065.00 | |
| **5/29/2013** | **Courtesy Adjustment** | | **$-150.00** |
| 6/6/2013 | Injection, Single | $1,065.00 | |
| **6/11/2013** | **Courtesy Adjustment** | | **$-150.00** |
| **6/12/2013** | **Courtesy Adjustment** | | **$-150.00** |
| 7/31/2013 | SI Joint Injection | $1,058.00 | |
| 8/14/2013 | SI Joint Injection | $1,058.00 | |
| **8/16/2013** | **Courtesy Adjustment** | | **$-150.00** |
| **8/16/2013** | **Courtesy Adjustment** | | **$-150.00** |
| 10/30/2013 | SI Joint Injection | $1,058.00 | |
| **12/10/2013** | **Courtesy Adjustment** | _____ | **$-150.00** |
| Total Amount of Procedure Expenses | | $8,485.00 | |
| Total Amount of Co-Pays Waived | | | **$1,200.00** |

**Medicare Advantage Patient 0002**

33.     Medicare Advantage patient #0002, who is covered by a Medicare Advantage insurance plan from AARP known as Complete MCR, with a co-pay of $200 due per treatment, was treated by Defendant Isaacson at Defendant Lee Island Coast Surgery Center on numerous

---

[1] The names of actual patients set forth herein have been omitted and assigned a number to protect their privacy. These names will be revealed to the Court upon request, or to Defendants upon unsealing of this case and entry of an appropriate protective order.

occasions.  A review of the billing receipt for patient #0002 shows the following:

| Date of Service | Procedure | Amount Billed | Courtesy Discount |
|---|---|---|---|
| 2/12/2016 | Ambulatory Surgery | $1,173.00 | |
| 2/26/2016 | Ambulatory Surgery | $1,173.00 | |
| 3/11/2016 | Ambulatory Surgery | $1,118.00 | |
| 3/24/2016 | Ambulatory Surgery | $1,118.00 | |
| **4/7/2016** | **Courtesy Discount** | | **$-100.00** |
| **4/7/2016** | **Courtesy Discount** | | **$-100.00** |
| **4/7/2016** | **Courtesy Discount** | | **$-100.00** |
| 4/8/2016 | Ambulatory Surgery | $1,118.00 | |
| **4/13/2016** | **Courtesy Discount** | | **$-100.00** |
| **4/27/2016** | **Courtesy Discount** | | **$-100.00** |
| 5/5/2016 | Ambulatory Surgery | $1,113.00 | |
| 5/5/2016 | Ambulatory Surgery | $1,037.00 | |
| 5/5/2016 | Ambulatory Surgery | $1,037.00 | |
| 5/18/2016 | Ambulatory Surgery | $1,113.00 | |
| 5/18/2016 | Ambulatory Surgery | $1,037.00 | |
| 5/18/2016 | Ambulatory Surgery | $1,037.00 | |
| **5/25/2016** | **Courtesy Discount** | | **$-100.00** |
| **6/13/2016** | **Courtesy Discount** | | **$-100.00** |
| Total Amount of Procedure Expenses | | $12,074.00 | |
| Total Amount of Co-Pays Waived | | | **$ 700.00** |

## Medicare Advantage Patient #0003

34.     Medicare Advantage patient #0003, who is covered by a Medicare Advantage insurance plan from AARP known as Complete MCR, with a co-pay of $200 due per treatment, was treated by Defendant Isaacson at Defendant Cape Coral Surgery Center on numerous occasions.  A review of the billing receipt for patient #0003 shows the following:

| Date of Service | Procedure | Amount Billed | Courtesy Discount |
|---|---|---|---|
| 5/24/2016 | Ambulatory Surgery | $1,418.00 | |
| 6/21/2016 | Ambulatory Surgery | $1,418.00 | |
| **7/6/2016** | **Courtesy Discount** | | **$-100.00** |
| 7/12/2016 | Ambulatory Surgery | $1,418.00 | |
| **7/23/2016** | **Courtesy Discount** | | **$-100.00** |

| Date | Procedure | Amount | Discount |
|---|---|---|---|
| 7/26/2016 | Ambulatory Surgery | $1,418.00 | |
| 8/30/2016 | Ambulatory Surgery | $1,118.00 | |
| 8/30/2016 | Ambulatory Surgery | $311.00 | |
| **8/30/2016** | **Courtesy Discount** | | **$-100.00** |
| **9/13/2016** | **Courtesy Discount** | | **$-100.00** |
| 9/20/2016 | Ambulatory Surgery | $1,118.00 | |
| 9/20/2016 | Ambulatory Surgery | $311.00 | |
| **10/6/2016** | **Courtesy Discount** | | **$-100.00** |
| **10/31/2016** | **Courtesy Discount** | | **$-100.00** |
| 11/30/2016 | Ambulatory Surgery | $1,418.00 | |
| **12/21/2016** | **Courtesy Discount** | | **$-100.00** |
| 12/21/2016 | Ambulatory Surgery | $1,418.00 | |
| **1/11/2017** | **Courtesy Discount** | | **$-100.00** |
| 1/11/2017 | Ambulatory Surgery | $1,111.00 | |
| 1/25/2017 | Ambulatory Surgery | $1,111.00 | |
| **1/31/2017** | **Courtesy Discount** | | **$-100.00** |
| 2/8/2017 | Ambulatory Surgery | $1,118.00 | |
| **2/13/2017** | **Courtesy Discount** | | **$-100.00** |
| 2/22/2017 | Ambulatory Surgery | $1,118.00 | |
| **2/27/2017** | **Courtesy Discount** | | **$-100.00** |
| **3/27/2017** | **Courtesy Discount** | _____ | **$-100.00** |

| | | | |
|---|---|---|---|
| Total Amount of Procedure Expenses | | $15,824.00 | |
| Total Amount of Co-Pays Waived | | | **$1,200.00** |

## Medicare Advantage Patient #0004

35.     Medicare Advantage patient #0004, who is covered by a Medicare Advantage insurance plan from United Health Care known as Medicare Complete, with a co-pay of $250 due per treatment, was treated by Defendant Isaacson at Defendant Lee Island Coast Surgery Center on numerous occasions. A review of the billing receipt for patient #0004 shows the following:

| Date of Service | Procedure | Amount Billed | Courtesy Discount |
|---|---|---|---|
| 1/17/2013 | Injection, Single | $1,065.00 | |
| 1/21/2013 | Injection, Single | $1,065.00 | |

| | | | |
|---|---|---|---|
| **2/12/2013** | **Courtesy Discount** | | **$-150.00** |
| 2/14/2013 | Injection, Single | $1,065.00 | |
| **2/26/2013** | **Courtesy Discount** | | **$-50.00** |
| **3/15/2013** | **Courtesy Discount** | | **$-150.00** |
| 11/18/2013 | Injection, Single | $980.00 | |
| 12/9/2013 | Injection, Single | $980.00 | |
| **12/12/2013** | **Courtesy Discount** | | **$-150.00** |
| **12/12/2013** | **Courtesy Discount** | | **$-150.00** |
| 12/20/2013 | Injection, Single | $980.00 | |
| **12/26/2013** | **Courtesy Discount** | _____ | **$-150.00** |

| | | |
|---|---|---|
| Total Amount of Procedure Expenses | $6,135.00 | |
| Total Amount of Co-Pays Waived | | **$800.00** |

## Medicare Advantage Patient #0005

36.     Medicare Advantage patient #0005, who is covered by a Medicare Advantage insurance plan from AARP known as Complete MCR, with a co-pay of $200 due per treatment, was treated by Defendant Isaacson at Defendant Lee Island Coast Surgery Center on numerous occasions.  A review of the billing receipt for patient #0005 shows the following:

| Date of Service | Procedure | Amount Billed | Courtesy Discount |
|---|---|---|---|
| 4/25/2016 | Ambulatory Surgery | $1,173.00 | |
| 5/9/2016 | Ambulatory Surgery | $1,173.00 | |
| **5/16/2016** | **Courtesy Discount** | | **$-100.00** |
| 5/23/2016 | Ambulatory Surgery | $1,173.00 | |
| **5/31/2016** | **Courtesy Discount** | | **$-100.00** |
| 6/13/2016 | Ambulatory Surgery | $1,113.00 | |
| 6/13/2016 | Ambulatory Surgery | $1,037.00 | |
| 6/13/2016 | Ambulatory Surgery | $1,037.00 | |
| **6/15/2016** | **Courtesy Discount** | | **$-100.00** |
| **7/7/2016** | **Courtesy Discount** | | **$-100.00** |
| 7/8/2016 | Ambulatory Surgery | $1,118.00 | |
| 7/8/2016 | Ambulatory Surgery | $311.00 | |
| 7/13/2016 | Ambulatory Surgery | $1,118.00 | |
| 7/13/2016 | Ambulatory Surgery | $311.00 | |
| **8/10/2016** | **Courtesy Discount** | | **$-100.00** |
| 8/12/2016 | Ambulatory Surgery | $1,118.00 | |

| Date | Procedure | Amount | Discount |
|---|---|---|---|
| 8/12/2016 | Ambulatory Surgery | $311.00 | |
| **8/16/2016** | **Courtesy Discount** | | **$-100.00** |
| **9/14/2016** | **Courtesy Discount** | | **$-100.00** |
| **9/14/2016** | **Courtesy Discount** | | **$-100.00** |
| 11/14/2016 | Ambulatory Surgery | $4,219.00 | |
| 1/16/2017 | Ambulatory Surgery | $1,111.00 | |
| **2/7/2017** | **Courtesy Discount** | | **$-100.00** |
| **4/25/2017** | **Courtesy Discount** | | **$-100.00** |
| **4/25/2017** | **Courtesy Discount** | _____ | **$-100.00** |

| | | | |
|---|---|---|---|
| Total Amount of Procedure Expenses | | $16,823.00 | |
| Total Amount of Co-Pays Waived | | | **$1,100.00** |

## Medicare Advantage Patient #0006:

37.     Medicare Advantage Advantage patient #0006, was covered by a Medicare Advantage insurance plan from Humana known as Humana Gold MCR during the time period of 2014-2015.  Under Humana's plan he was responsible for a $250 co-pay due per treatment. From 2016 through the present, patient #0006 has been covered by a Medicare Advantage insurance plan from AARP known as Medicare Complete HMO.   Under this plan he is responsible for a $200 co-pay due per treatment.  Patient #0006 has been treated by Defendant Isaacson numerous times from 2014 – present at Defendant Lee Island Coast Surgery Center.  A review of the billing receipt shows the following:

| Date of Service | Procedure | Amounts Billed | Courtesy Discount |
|---|---|---|---|
| 11/4/2014 | Ambulatory Surgery | $1,117.27 | |
| 11/18/2014 | Ambulatory Surgery | $1,117.27 | |
| **11/25/2014** | **Courtesy Discount** | | **$-150.00** |
| 12/4/2014 | Ambulatory Surgery | $1,065.00 | |
| 12/4/2014 | Radiology | $196.00 | |
| **12/9/2014** | **Courtesy Discount** | | **$-150.00** |
| 12/18/2014 | Ambulatory Surgery | $1,065.00 | |
| 12/18/2014 | Radiology | $196.00 | |
| **1/5/2015** | **Courtesy Discount** | | **$-150.00** |
| 1/6/2015 | Ambulatory Surgery | $1,065.00 | |

| Date | Description | Amount | Discount |
|---|---|---|---|
| 1/6/2015 | Radiology | $196.00 | |
| **1/21/2015** | **Courtesy Discount** | | **$-150.00** |
| 2/23/2015 | Ambulatory Surgery | $1,060.00 | |
| 2/23/2015 | Ambulatory Surgery | $791.00 | |
| 2/23/2015 | Ambulatory Surgery | $791.00 | |
| **2/27/2015** | **Courtesy Discount** | | **$-150.00** |
| **2/27/2015** | **Courtesy Discount** | | **$-150.00** |
| 4/3/2015 | Ambulatory Surgery | $1,117.27 | |
| **4/6/2015** | **Courtesy Discount** | | **$-250.00** |
| 4/20/2015 | Ambulatory Surgery | $1,117.27 | |
| 7/30/2015 | Ambulatory Surgery | $1,065.00 | |
| 7/30/2015 | Radiology | $196.00 | |
| 8/13/2015 | Ambulatory Surgery | $1,065.00 | |
| 8/13/2015 | Radiology | $196.00 | |
| 8/28/2015 | Ambulatory Surgery | $1,065.00 | |
| 8/28/2015 | Radiology | $196.00 | |
| **9/15/2015** | **Courtesy Discount** | | **$-250.00** |
| **9/18/2015** | **Courtesy Discount** | | **$-250.00** |
| **9/30/2015** | **Courtesy Discount** | | **$-250.00** |
| 11/12/2015 | Ambulatory Surgery | $1,117.27 | |
| 11/25/2015 | Ambulatory Surgery | $1,117.27 | |
| **12/3/2015** | **Courtesy Discount** | | **$-250.00** |
| **12/21/2015** | **Courtesy Discount** | | **$-250.00** |
| 1/18/2016 | Injection, Diagnostic | $1,113.00 | |
| 1/18/2016 | Injection, Diagnostic | $831.00 | |
| 1/18/2016 | Injection, Diagnostic | $831.00 | |
| 2/1/2016 | Injection, Diagnostic | $1,113.00 | |
| 2/1/2016 | Injection, Diagnostic | $831.00 | |
| 2/1/2016 | Injection, Diagnostic | $831.00 | |
| 2/15/2016 | Injection | $1,173.00 | |
| 3/7/2016 | Injection | $1,173.00 | |
| **3/9/2016** | **Courtesy Discount** | | **$-100.00** |
| **3/16/2016** | **Courtesy Discount** | | **$-100.00** |
| **4/7/2016** | **Courtesy Discount** | | **$-100.00** |
| **4/7/2016** | **Courtesy Discount** | | **$-100.00** |
| 4/7/2016 | Injection | $1,118.00 | |
| 4/7/2016 | Fluoroscopic Guidance | $311.00 | |
| 4/21/2016 | Injection | $1,118.00 | |
| 4/21/2016 | Fluoroscopic Guidance | $311.00 | |
| **4/27/2016** | **Courtesy Discount** | | **$-100.00** |

| | | | |
|---|---|---|---|
| 5/5/2016 | Injection | $1,118.00 | |
| 5/5/2016 | Fluoroscopic Guidance | $311.00 | |
| **5/16/2016** | **Courtesy Discount** | | **$-100.00** |
| **5/25/2016** | **Courtesy Discount** | | **$-100.00** |
| 8/3/2016 | Injection | $1,173.00 | |
| 8/18/2016 | Ambulatory Surgery | $1,173.00 | |
| **8/24/2016** | **Courtesy Discount** | | **$-100.00** |
| 9/7/2016 | Ambulatory Surgery | $1,173.00 | |
| **9/14/2016** | **Courtesy Discount** | | **$-100.00** |
| 9/22/2016 | Ambulatory Surgery | $1,173.00 | |
| **9/28/2016** | **Courtesy Discount** | | **$-100.00** |
| 10/6/2016 | Ambulatory Surgery | $1,173.00 | |
| **10/13/2016** | **Courtesy Discount** | | **$-100.00** |
| 11/3/2016 | Ambulatory Surgery | $1,118.00 | |
| 11/3/2016 | Radiology | $311.00 | |
| **11/9/2016** | **Courtesy Discount** | | **$-100.00** |
| **12/7/2016** | **Courtesy Discount** | | **$-100.00** |
| 1/9/2017 | Ambulatory Surgery | $1,118.00 | |
| 1/27/2017 | Ambulatory Surgery | $1,118.00 | |
| **2/17/2017** | **Courtesy Discount** | | **$-100.00** |
| 3/24/2017 | Ambulatory Surgery | $1,111.00 | |
| **4/25/2017** | **Courtesy Discount** | _____ | **$-100.00** |
| | | | |
| Total Amount of Procedure Expenses | | $39,735.62 | |
| Total Amount of Co-Pays Waived | | | **$3,900.00** |

## Medicare Advantage Patient #0007:

38.     Medicare Advantage patient #0007 is covered by a Medicare Advantage insurance plan from Blue Cross Blue Shield known as MCR HMO. Under this plan she is responsible for a $250/per treatment co-pay.

39.     On January 19, 2017, Relator was working on credit balances and discovered that patient #0007 had actually paid the correct amount due for procedures performed at Defendant Lee Island Coast Surgery Center. Due to the courtesy adjustment that had been posted to the account, patient #0007 ended up with a credit of $150.00 on her account. Relator asked Christina Rhodes if she should refund patient #0007 or reverse the courtesy adjustment. Christina Rhodes

told Relator that she should refund the credit because per Defendant Isaacson's policy, Medicare Advantage patients were only to pay $100 per visit.

40.     A refund request was submitted by Relator in the amount of $150.00 which was approved by Heather Moore.  In the Reason for Refund explanation for the request, it is written:

> *"PT ONLY TO PAY $100 PER DR I, PT PAID $278.45, PT TOTAL RESP IS $228.45, PT*
> *PAID $378.45"*

41.     On February 22, 2017, a refund in the amount of $150 was issued to patient #0007 as she had paid the correct amount of co-pay due, yet once discovered she was refunded the amount over the $100 that all Medicare Advantage patients are charged, regardless of their actual co-pay responsibilities or financial need.

42.     These patient examples are provided to typify the universal lowering or waiving of co-pays for Medicare Advantage patients.

43.     Beyond simply reducing or waiving co-pays, no amount due by patients is ever pursued in collections and billing staff like Relator are forbidden from contacting any of Defendant Dr. Isaacson's patients in an attempt to collect facility charges due.  This practice does not take place with regard to any other type of insured or private pay patient.

44.     On May 24, 2017, Relator received the below email regarding attempts to collect any amounts due from any patients of Defendant Dr. Isaacson:

**Strunk, Melissa**

| | |
|---|---|
| **From:** | Rhodes, Christina |
| **Sent:** | Wednesday, May 24, 2017 6:07 PM |
| **To:** | Strunk, Melissa |
| **Cc:** | Moore, Heather |
| **Subject:** | Pain Accounts |
| **Attachments:** | image001.jpg |

Melissa

I spoke to Dr. Isaacson about the accounts we gave to him. He never looked at them and does not plan to review them. At first he said to write them all off. After we further discussed it, he agreed that we can write off the accounts of the active patients, but proceed with collections on patients that are no longer treating.

I think we need to take it a step further and discuss how we can be more proactive on the front end collecting from his patients for the facility fee. Even if we don't collect at the TOS we need to try to collect something towards their balance when they continue to come in.

Let's discuss possibly Friday when we all have time.

Thanks -

*Christina Rhodes*
Administrator/Business Manager
Cape Coral Surgery Center
(P) 239-242-8010
(F) 239-242-8020

**⧱ SURGERY PARTNERS**

## VI.   LEGAL AND REGULATORY FRAMEWORK

### A.  The Medicare Copayment

45.   Under Medicare Part B, Medicare generally pays 80 percent of the reasonable charges (as established by the Medicare Physician Fee Schedule) for medically necessary services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1)(A).

46.   Medicare beneficiaries are generally expected to pay the remaining 20 percent in the form of a copayment, also called a "co-pay" or "coinsurance" payment.

47.   The copayment is intended to minimize costs to federal healthcare programs and

beneficiaries by incentivizing beneficiaries to be better health care consumers—selecting services because they are medically needed, rather than simply because they are free. *See* HHS Office of Inspector General Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375 (Dec. 19, 1994).

48.   Consequently, federal law prohibits the routine waiver of copayments, and except in narrow circumstances, the non-routine waiver of copayments. *Id.* (citing 18 U.S.C. §§ 287, 1001; 31 U.S.C. § 3729; 42 C.F.R. §§ 1320a-7, 1320a-7a, 1320a-7b).

49.   The routine waiver of copayments is prohibited, first, because "[a] provider, practitioner or supplier who routinely waives Medicare copayments . . . is misstating its actual charge."

50.   A Special Fraud Alert succinctly explains why such practices are fraud: "[I]f a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item." Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65374–75.

51.   Further, as the Medicare Claims Processing Manual (Ch. 23 § 80.8.1) explains: Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual" charge for the purpose of processing a claim or for the purpose of determining customary charges.

52.   The routine waiver of copayments may constitute impermissible remuneration under provisions of the Social Security Act, including the Anti-Kickback Statute, 42 U.S.C. §

1320a-7b(b), and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a.

53.     As the HHS Office of Inspector General explained:

> In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments . . . could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* Medicare Program Integrity Manual, Ch. 4 § 4.22.1.1 ("Routine waivers of coinsurance or deductibles are unlawful because they could result in . . . violation of the anti-kickback statute.").

54.     Similarly, § 1128A(a)(5) of the Social Security Act prohibits the offer or transfer of "remuneration" to a Medicare beneficiary that the offeror or transferor knows or should know is likely to influence the beneficiary's healthcare decisions. 42 U.S.C. § 1320a-7a(a)(5); *see also* OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 30, 2002). Prohibited "remuneration" includes "the waiver of coinsurance and deductible amounts (or any part thereof)." 42 U.S.C. § 1320a-7a(i)(6).

55.     Waiver of copayments implicates section 1128A(a) (5) of the Act if the patient for whom the copayment is waived is a Federal healthcare program beneficiary who is not financially needy.  OIG has previously stated that providers that routinely waive Medicare cost-sharing amounts for reasons unrelated to individualized, good faith assessments of financial hardship may be held liable under the anti-kickback statute. *See* OIG Special Fraud Alert on Routine Waiver of Medicare Part B Copayments and Deductibles, 59 Fed. Reg. 65372, 65374 (Dec. 19, 1994). Such waivers may constitute prohibited remuneration to induce referrals, as well as a violation of the civil monetary prohibition against inducements to beneficiaries.

56.     Even if non-routine, the waiver of a copayment is permissible only in narrow circumstances. The waiver must be (1) unadvertised, and must either (2) "address the special

financial needs of a particular patient" or (3) occur after "a good faith effort to collect" has been exhausted. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* 42 U.S.C. § 1320a-7a(i)(6) (prohibited remuneration does not include "the waiver of coinsurance" if (i) "the waiver is not offered as part of any advertisement or solicitation;" (ii) "the person does not routinely waive coinsurance;" and (iii) the person determined "in good faith that the individual is in financial need" or failed to collect "after making reasonable collection efforts"); 42 C.F.R. § 1003.101 (same).

57.   Copayment waivers are not permissible if they are advertised. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. Advertising includes indirect marketing or promotional efforts, or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups. OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 30, 2002).

58.   A copayment waiver based on financial hardship is prohibited if it is not supported by a "good faith" assessment of the individual beneficiary's financial need. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The "[r]outine use of 'Financial hardship' forms which state that the beneficiary is unable to pay the coinsurance" is insufficient. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375.

59.   A copayment waiver based on a failure to collect is prohibited if it is not preceded by a "good faith" collection effort. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The collection effort must be more than "token" and must be similar to efforts made to collect comparable amounts from non-Medicare patients.

Medicare Claims Processing Manual, Ch. 23, § 80.8.1.

### B. The False Claims Act

60.     The False Claims Act or FCA provides for the award of treble damages and civil

penalties for, *inter alia,* knowingly submitting, or causing the submission of, false or fraudulent

claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

61.     The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(C) conspires to commit a violation of the Act specifically to violate the other subparagraphs which create liability;...

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .31 U.S.C. § 3729

62.     For purposes of the FCA:

"the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b).

### C.     The Anti-Kickback Statute

63.     The Anti-Kickback Statute makes it illegal for individuals or entities to

knowingly and willfully offer or pay remuneration (including any kickback, bribe, or rebate) to

any person to induce business that is reimbursed under a Federal health care program. 42 U.S.C. § 1320a-7b.

64.     Congress enacted a prohibition against the payment of kickbacks in any form to protect Medicare and Medicaid programs because remuneration can influence health care decisions that would result in services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

65.     As codified in the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 11 1-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

### D.     Medicare

66.     The Medicare program, which Congress enacted in 1965 as part of Title XVIII of the Social Security Act pays for the costs of healthcare services for certain individuals. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

67.     Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

68.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity,

the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

69.    There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve Part B for services billed by the Defendants to Medicare.

70.    When providing injections as a service under Part B Medicare, physicians purchase the drugs, manage inventory, administer drugs in-office, and submit claims to Medicare insurers for reimbursement of the drug and certain associated administrative costs, such as co-pay collections.  In order to get paid from Medicare, providers (like Defendants herein) complete and submit a claim for payment on a designated Health Insurance Claim Form, which during the relevant time period, was or has been designated CMS 1500.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

71.    To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my

immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

72.     Generally, Medicare covers 80% of the "reasonable charges" billed by the provider for the Medicare-approved health services provided to a patient.  42 U.S.C. § 1395(a)(1).  Accordingly, the patient is normally required to contribute the remaining 20% as a copayment. 42 U.S.C. § 1395cc(a)(2)(A)(ii).

73.     Waiver of copayments in consideration of a particular patient's financial hardship is permitted in exceptional circumstances.  The hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient, supported by documentation of financial hardship.  Except in such special cases, a good faith effort to collect deductibles and copayments must be made.

### E.  Medicare Participation

74.     In order to participate in the Medicare program, physicians and facilities like Defendants must periodically sign an application to participate in the program.  The application must be signed by an authorized representative of the provider, and contains a certification statement that reads:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

75.     Once a provider has been accepted as a participant in the Medicare program, it must enter into an Electronic Data Interchange ("EDI") Enrollment Agreement.

76.     As part of that EDI Enrollment Agreement, providers agree to "submit claims that are accurate, complete, and truthful."  In signing the EDI Enrollment Agreement, Medicare providers acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under Medicare, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

77.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C; *see also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

78.     Accordingly, if CMS pays a claim for medical goods or services that was not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(*l*)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395*l*(j).

## VII.     CAUSES OF ACTION

### COUNT I
(False Claims Act: Presentation of False Claims for Payment)
(31 U.S.C. § 3729(a)(1)(A))

79.     Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     As a result of offering kickbacks in the form of waived or lowered copayments, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A), Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States for surgical and related ancillary care that were false as a result of illegal kickbacks.

81.     By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**COUNT II**
(False Claims Act: Use of False Statements)
(31 U.S.C. §3729(a)(1)(B))

82.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

83.     As a result of providing kickbacks in the form of waived copayments, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A), Defendants knowingly caused false records or statements to be made that were material to getting false or fraudulent claims paid by Medicare, in violation of 31 U.S.C. § 3729(a)(1)(B).

84.     By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT III
(False Claims Act: Presentation of False Claims for Payment)
(31 U.S.C. § 3729(a)(1)(A))

85.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

86.     By inflating the amount of the value of services rendered to Medicare beneficiaries by including the waived copayment amount when submitting its claims for reimbursement, Defendants caused false claims to be presented for reimbursement by Medicare.

87.     Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

88.     By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT IV
(False Claims Act: Use of False Statements)
(31 U.S.C. § 3729(a)(1)(B))

89.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

90.     By inflating the amount of the value of services rendered to Medicare beneficiaries by including the waived copayment amount when submitting its claims for reimbursement, Defendants knowingly caused false records or statements to be made that were material to getting false or fraudulent claims paid by Medicare.

91.     Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

92.    By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## COUNT V
### (False Claims Act: False Record Material to Obligation to Pay)
### (31 U.S.C. § 3729(a)(1)(G))

93.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

94.    Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

95.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands judgment against Defendants as to Counts I-V of the Complaint, as follows:

A. The Defendants be ordered to cease and desist violating 31 U.S.C. §3729 *et seq.* as set forth above.

B. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

C. That this Court enters judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq.*

D. That Relator be awarded all costs incurred, including her attorneys' fees.

E.  That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

## DEMAND FOR JURY TRIAL

Relator demands a jury trial in this case.

Dated June 21, 2017

Respectfully submitted,

BY: _____

James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone

John Yanchunis (FBN 324681)
jyanchunis@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 318-5169 Telephone

*Attorneys for Plaintiff/Relator*